## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2019, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Worthley
Worthley Law LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John S. Ensign,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | February 21, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1784<br><br>Appeal from the Porter Superior Court<br><br>The Honorable Mary R. Harper, Judge<br><br>Trial Court Cause No.<br>64D05-1601-F5-501 |

**Brown, Judge.**

[1] John S. Ensign appeals his convictions for two counts of burglary as level 5 felonies and theft as a level 6 felony. Ensign raises two issues which we revise and restate as:

> I. Whether the evidence is sufficient to sustain his convictions; and

> II. Whether his sentence is inappropriate in light of the nature of the offenses and the character of the offender.

We affirm.

### Facts and Procedural History

[2] In the early morning of April 21, 2015, Ensign drove Sean Kellen to a location on 750 West in Porter County, Indiana, and parked his vehicle on the street. The two men went into a barn belonging to William LaFever using a door which was closed but unlocked and took a television, a Lincoln welder, surveying equipment and tripod, impact wrenches and sockets, and other items. The two men then went into a detached garage belonging to Jeffrey Boyd, who was LaFever's neighbor, using a door which was closed with a hasp but unlocked and took Husqvarna chainsaws, an Echo weed trimmer, and a leaf blower. Ensign and Kellen then went to a vehicle parked in a driveway belonging to Michael Arnn, who lived near LaFever and Boyd, and took three

paintball markers.[1] Ensign and Kellen loaded the items into Ensign's vehicle, and Ensign drove to a hotel where Kellen was living.

[3] Ensign and Kellen took the items to a resale shop in Lake Station, Indiana, owned by Jack Mohoi. According to Mohoi and his girlfriend, Mohoi negotiated with Ensign, and Kellen did not say much. Ensign and Kellen initially asked for $5,000 but eventually accepted $500 for some of the items. Kellen signed a receipt but signed another person's name. A surveillance video recording showing the interior of Mohoi's store depicts Ensign and Kellen interacting with Mohio. Ensign and Kellen left together and split the $500 equally. Mohoi posted some of the items he purchased on Craigslist.

[4] LaFever noticed there was mud on the floor of his detached garage which is about ten feet from his back door. Later, while he was at work, his wife called him and said that a door to the vehicle she drives was open, LaFever called his father who lived next door and asked him to check the barn which is a couple hundred feet from the house, his father did so and reported that a television and a Lincoln welder were missing, and LaFever contacted the police. LaFever learned from Boyd that he was missing some Husqvarna chainsaws and an Echo weed trimmer. Later, LaFever noticed that some of the items missing from his and Boyd's properties were for sale on Craigslist by Mohoi's resale shop. Mohoi and his girlfriend later identified Ensign and Kellen from photo

---

[1] Arnn testified "We don't like to classify them as guns. We like to call them by what they're actually called is markers." Transcript Volume I at 74.

arrays. Kellen was later arrested on an unrelated matter. Ensign told police that he never sold anything to Mohoi but also confirmed that he was the person in the surveillance video.

[5] The State charged Ensign as amended with Count I, burglary of a building belonging to LaFever as a level 5 felony; Count II, burglary of a building belonging to Boyd as a level 5 felony; and Count III, theft of property belonging to Arnn as a level 6 felony. The jury heard testimony from LaFever, Boyd, Arnn, Mohoi, Mohoi's girlfriend, Kellen, and a detective, and a portion of the surveillance video recording was played for the jury. LaFever testified that he had a detached garage which was located about ten feet from the back door to his house, that he had a barn which was located a couple hundred feet from the house, that he first noticed mud on the garage floor, and that he later learned that items had been taken from his barn. Arnn testified that he noticed that his three paintball markers were missing and that he saw just one set of footprints from the driveway to the road.

[6] Kellen testified that he and Ensign went in a barn where they took a television, welder, and tools, and when asked if he knew who went in first, he answered "[w]e both went in." Transcript Volume I at 149. When asked if he recalled who went to the vehicle in a driveway, Kellen testified "[w]e both did." *Id*. at 151. On cross-examination by Ensign's counsel, Kellen indicated that in April 2015 he used heroin daily, that his girlfriend did not make much at her job, and that they lived in a hotel. Kellen further indicated that he had been arrested for a separate burglary in November 2015; he knew he was a suspect and could be

charged in this case; he pled guilty in this case; his criminal history includes crimes that would indicate dishonesty; he decided it was in his best interest to talk to the detective and the fact that he could place at least some blame on somebody else could weigh in his favor; and after April 21, 2015, he and Ensign had a falling out resulting in a physical confrontation. He indicated that his plea agreement resolved both this case and the unrelated burglary and called for a cap of six years, he received an executed sentence of five years, he received significantly less time than he was facing, the State agreed not to file an habitual offender enhancement, and that it did pay off to cooperate with the detective. The State also presented the testimony of a detective who obtained a warrant for Ensign's cell phone records and learned that Ensign had called Mohoi's phone just prior to entering the resale store and later that day called a phone number associated with Kellen.

[7]     The jury found Ensign guilty on all three counts. The probation officer who prepared the presentence investigation report (the "PSI") recommended that Ensign be sentenced to six years on Counts I and II and to two years on Count III and that the sentences in Counts I and II be served consecutive to the sentence in Count III for a total of eight years in the Department of Correction ("DOC"). In its sentencing order, the court found that aggravators included Ensign's criminal history, his violation of probation, and that he was charged with new criminal conduct while on bond. It found as a mitigator that Ensign had made or will make restitution; noted that the Indiana risk assessment system tool ("IRAS") placed Ensign in the very high risk to reoffend category;

and sentenced him to six years for his level 5 felonies under Counts I and II and two years and 182 days for his level 6 felony under Count III to be served concurrently.

## Discussion

### I.

[8] The first issue is whether the evidence is sufficient to sustain Ensign's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[9] Ensign argues that there is no forensic evidence linking him to the vehicle, garage, or barn and no witness was present to corroborate Kellen's version of events. He asserts that Kellen's version of events was manufactured and his criminal history shows a propensity to lie, Kellen was a daily heroin user, and "[c]oupling the propensity to lie with the substantial motivation, the testimony provided by Mr. Kellen is incredibly dubious." Appellant's Brief at 10. He also argues that, although Kellen testified that he and Ensign entered the vehicle together when the paintball markers were removed, the vehicle owner testified that he saw one set of footprints from the car to the road, that the owner of the detached garage noticed mud on his garage floor, and that therefore Kellen's

version of events placing Ensign inside the detached garage and the barn were clearly erroneous.

[10] The State maintains the incredible dubiosity rule is inapplicable because Kellen was not the sole witness, Mohoi and his girlfriend saw Ensign in possession of the stolen property, the victims of the offenses provided testimony about the items taken, and it presented the surveillance video. It argues there was nothing impossible or improbable about Kellen's testimony, that Ensign is merely attempting to attack Kellen's credibility as a witness, and that his arguments amount to a request to reweigh the evidence and judge the credibility of the witnesses.

[11] Ind. Code § 35-43-2-1 provides that a person who breaks and enters the building or structure of another person with intent to commit a felony or theft in it commits burglary as a level 5 felony. Ind. Code § 35-43-4-2 provides that a person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft and that the offense is a level 6 felony if the value of the property is at least $750 and less than $50,000.

[12] We observe that the uncorroborated testimony of one witness is sufficient to sustain a conviction. *Ferrell v. State*, 565 N.E.2d 1070, 1072-1073 (Ind. 1991). To the extent Ensign asserts that the incredible dubiosity rule requires reversal of his conviction, we note that this rule applies only in very narrow

circumstances. *See Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). The rule is expressed as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Id.* (citations omitted).

[13] Ensign fails to show that Kellen's testimony was inherently contradictory or so inherently improbable that no reasonable person could believe it. To the extent there was any conflict between Kellen's testimony and the testimony of others, this is an issue of witness credibility, and we do not assess witness credibility or reweigh the evidence. *See Jordan*, 656 N.E.2d at 817. The witnesses were thoroughly examined and cross-examined, and Ensign's counsel questioned Kellen regarding his heroin use and criminal history, his prior and current relationship with Ensign, and any leniency he hoped to gain or gained by cooperating with law enforcement. Based upon our review of the evidence as set forth above and in the record, we conclude that the State presented evidence of a probative nature from which a trier of fact could find beyond a reasonable doubt that Ensign committed the charged crimes.

II.

[14]    The next issue is whether Ensign's sentence is inappropriate in light of the nature of his offenses and his character. Ensign argues that three of his prior felony convictions would likely be charged as misdemeanors today, none of his prior charges were more serious than a class D felony, and he was previously successful with probation and parole. He argues that the nature of the burglary was wholly outside the realm of his prior criminal acts and that he was a substance abuser and thief, not one who broke into buildings. He notes the court did not consider his lack of parental role models and substance abuse problems and that he received the maximum sentence.

[15]    The State responds that Ensign orchestrated the plan, drove Kellen to the location where the crimes were committed, and took the lead in negotiating with Mohoi. It points out that Ensign was adjudicated delinquent for nine felonies as a juvenile and charged approximately thirty-six times resulting in three felony and twenty-three misdemeanor convictions as an adult, that his history is riddled with countless thefts, robberies, burglaries, and receiving stolen property, that he was on probation when he committed the offenses, and that his criminal history places him among the worst of offenders. It also argues that Ensign's persistent substance abuse reflects negatively on his character.

[16]    Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade

the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[17] Ind. Code § 35-50-2-6 provides that a person who commits a level 5 felony shall be imprisoned for a fixed term of between one and six years, with the advisory sentence being three years. Ind. Code § 35-50-2-7 provides that a person who commits a level 6 felony shall be imprisoned for a fixed term of between six months and two and one-half years, with the advisory sentence being one year. The court sentenced Ensign to six years for his convictions for burglary as level 5 felonies and two years and 182 days for his conviction for theft as a level 6 felony and ordered that the sentences be served concurrently.

[18] Our review of the nature of the offenses reveals that Ensign and Kellen drove to a street in Porter County, took numerous items from two structures and a vehicle, sold a number of the items at a resale shop, and split the proceeds.

[19] Our review of the character of the offender reveals that, according to the PSI, Ensign was referred to juvenile authorities four times resulting in nine felony adjudications and one misdemeanor adjudication, and as an adult was arrested/charged thirty-six times consisting of fifteen felonies and thirty-nine misdemeanor charges resulting in three felony convictions and twenty-three misdemeanor convictions. Ensign's juvenile history includes burglaries and thefts which would be felonies if committed by an adult. His adult history includes receiving stolen property and two counts of theft as class D felonies as well as resisting law enforcement, driving while suspended, two counts of

battery, two counts of criminal mischief, unauthorized entry of a motor vehicle, false informing, and multiple counts of public intoxication as misdemeanors. Ensign has been placed on and violated probation.

[20] The PSI further states that Ensign's family and peers possess extensive criminal records, Ensign met Kellen while in jail, and Ensign reported he does not have a permanent residence, has lived with his mother, step-mother, and girlfriend, and "couch surfs." The PSI provides that Ensign's chronic substance abuse issues began when he was fourteen or fifteen years old, he reported he was an alcoholic by the time he was sixteen years old, he began smoking marijuana when he was fourteen or fifteen years old, and that he started injecting heroin when he was thirty-two years old and was injecting heroin daily at the time of the offense. It further provides that he had been in a Suboxone program for one year prior to being remanded by the court in March 2018, that he relayed he has also abused cocaine, mushrooms, LSD, and hashish, and that his only formal substance abuse treatment was court ordered and he never successfully completed treatment. The PSI also indicates that Ensign scored high in six of seven domains of the IRAS and that his overall risk assessment score places him in the very high risk to reoffend category. The PSI states that Ensign's risk level is based on many different factors including his criminal history, lack of employment, substance abuse, peers, well-established pattern of criminal behavior, and criminal attitude and that he has shown little or no interest in making changes in these areas. The probation officer who prepared the PSI

recommended that Ensign be sentenced to an aggregate term of eight years in the DOC.

[21] After due consideration, we conclude that Ensign has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offenses and his character.[2]

[22] For the foregoing reasons, we affirm Ensign's convictions and sentence.

[23] Affirmed.

Bailey, J., and Bradford, J., concur.

---

[2] To the extent Ensign argues the court abused its discretion in sentencing him by failing to consider his lack of parental role models, his substance abuse problems, or other factors, we need not address this issue because we find that his sentence is not inappropriate. *See Chappell v. State*, 966 N.E.2d 124, 134 n.10 (Ind. Ct. App. 2012) (noting that any error in failing to consider the defendant's guilty plea as a mitigating factor is harmless if the sentence is not inappropriate) (citing *Windhorst v. State*, 868 N.E.2d 504, 507 (Ind. 2007) (holding that, in the absence of a proper sentencing order, Indiana appellate courts may either remand for resentencing or exercise their authority to review the sentence pursuant to Ind. Appellate Rule 7(B)), *reh'g denied*; *Mendoza v. State*, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007) (noting that, "even if the trial court is found to have abused its discretion in the process it used to sentence the defendant, the error is harmless if the sentence imposed was not inappropriate"), *trans. denied*), *trans. denied*.